## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

JON VAN HUSS,                    )
                                 )
      Plaintiff,                 )      Case No. 24-cv-00213-SH
                                 )            (base file)
v.                               )
                                 )      Consolidated with
BILL'S ELECTRIC, INC.,           )       24-cv-00547-SH
                                 )
      Defendant.                 )

### OPINION AND ORDER

Before the Court is Defendant's motion, seeking summary judgment on Plaintiff's wage and discrimination claims.[1]  In these consolidated cases, Plaintiff alleges his 2022 termination violated federal and state protections against age and disability discrimination, and that Defendant failed to pay him overtime and bonuses.  Plaintiff's discrimination claims fail, because no factfinder could find age to be a but-for reason for his termination (and he has abandoned any claims of disability discrimination).  As for the failure-to-pay, Plaintiff was an exempt employee who was ineligible for overtime, and he was not due a bonus after his termination.  The Court, therefore, grants summary judgment to Defendant on all claims.

### PROCEDURAL BACKGROUND

Plaintiff Jon Van Huss ("Van Huss") brings these consolidated cases against Defendant Bill's Electric, Inc. ("BEI), asserting violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634; the Americans with Disabilities Act

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (ECF No. 13 at 4; *see also Van Huss v. Bill's Electric, Inc.*, Case No. 4:24-cv-00547-SH (the "Consol. Case"), ECF No. 13 at 4 (N.D. Okla. Dec. 4, 2024).)

("ADA"), 42 U.S.C. §§ 12101–12213; the Oklahoma Anti-Discrimination Act ("OADA"), Okla. Stat. tit. 25, §§ 1101–1706; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219; and the Oklahoma Protection of Labor Act ("OPLA"), Okla. Stat. tit. 40, §§ 160–87. (*See* ECF No. 2-1; Consol. Case ECF No. 2-1.)

BEI has filed for summary judgment as to all of Plaintiff's claims, arguing that (1) Van Huss cannot show a prima facie case of age discrimination or that BEI's reasons for firing him were pretext; (2) Van Huss did not need any disability-related accommodations and otherwise cannot show disability discrimination; (3) Van Huss was an exempt employee not entitled to overtime pay; and (4) Van Huss was not eligible for a bonus after his termination.  (ECF No. 32.)  Van Huss concedes the disability claim, but he otherwise argues there are sufficient disputed facts to go to trial.  (ECF No. 33.) Summary judgment has been fully briefed, and the parties have been granted a stay of the remaining deadlines pending resolution of BEI's motion.  (ECF Nos. 34–36.)

## FACTUAL BACKGROUND

Unless stated otherwise, the following facts are undisputed for purposes of summary judgment:

Van Huss began his employment at BEI as an Unlimited Electrical Journeyman in 2015.  (Def. UMF 5.[2])  BEI is an electrical contractor that specializes in providing services and knowledge to clients on electrical projects.  (Def. UMF 1.)  In November or December

---

[2] Van Huss has explicitly admitted, without qualification, BEI's characterization of certain "undisputed material facts."  (*See, e.g.*, ECF No. 33 at 2.)  In those circumstances, the Court cites to Defendant's Statement of Undisputed Material Facts by number ("Def. UMF __").  Where there is no unqualified, material admission, the Court cites to the underlying evidence.

2020, at the age of 64,[3] Van Huss was promoted to the position of Project Manager/Estimator ("PM/E") by Dwight Harvey ("Harvey"), BEI's Oklahoma Branch Manager.  (Def. UMF 7; ECF No. 33-1 at 9:1–3.)  Harvey told Van Huss he had to be in that position for five years, and Van Huss committed to do so.[4]  (ECF No. 33-1 at 104:14–105:13.[5])

### The PM/E Role and Pay Structure

Among other things, Van Huss's PM/E position involved: (1) preparing project bids; (2) designing and managing customer's electrical construction projects; (3) providing customer solutions to ensure project viability; (4) providing and correcting electrical plans; (5) procuring equipment and gathering quotes for materials and services; (6) evaluating the costs, experience, quality, and availability of materials and services; (7) making recommendations to customers as to materials and services; (8) coordinating with suppliers and manufacturers; (9) reviewing and interpreting plans and blueprints; (10) communicating with and directing employees as to how to work on projects;

---

[3] Van Huss does not dispute BEI's assertion that Van Huss was 62 when promoted (ECF No. 33 at 2), but it appears he was actually 64.  Van Huss's birthday is in March 1956. (ECF No. 33-1 at 9:1–3; *see also* ECF No. 33 at 2.)  In "November or December of 2020," he would have been 64, not 62.  This two-year discrepancy is not material.

[4] In its reply, BEI did not respond to Van Huss's statement of additional material facts (ECF No. 34), as required by local rule.  *See* LCvR 56-1(d).  Pursuant to Fed. R. Civ. P. 56(e)(2), the Court may consider those facts undisputed for purposes of the motion. Nevertheless, the Court has reviewed the cited material and finds the facts listed in this opinion to be supported.  *See* Fed. R. Civ. P. 56, advisory ctte.'s note to 2010 am., subdiv. (e) ("the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute").  The Court has not accepted statements of fact that are not supported by the record or explicitly admitted by the opposing party.

[5] Citations to page numbers refer to the page number in the court-provided header, except for depositions, where the Court uses the page:line numbering from the deposition transcript itself.

(11) inspecting the work of BEI employees and contractors; (12) instructing electricians; (13) tracking project materials, costs, and billing; (14) making work schedules; (15) communicating with customers regarding projects; (16) conducting inspections at project sites; and (17) reviewing contracts. (Def. UMF 8.)  In his position, Van Huss engaged in manual labor between 15 and 20 percent of the time. (Def. UMF 9.)

It is undisputed that Van Huss exercised discretion and independent judgment in the "estimator" part of his job. (ECF No. 33 at 3.)  Van Huss would estimate costs for an entire job that BEI had bid, working on projects from $10,000 to over $1 million. (ECF No. 33-1 at 36:2–37:5, 40:6–11.)  Van Huss would evaluate a variety of factors and make recommendations on source materials based on his evaluation. (*Id*. at 41:21–42:6.)

As project manager, Van Huss had foremen who reported to him and whom he instructed. (ECF No. 33-1 at 33:9–11, 33:23–34:4, 34:25–35:15.)  It was his job as project manager to make sure the foremen were doing what they were supposed to do.[6]  (*Id*. at 35:16–19.)  Van Huss inspected work and made schedules for when work was supposed to be done and how it was to be completed. (*Id*. at 15:11–17.)  He also instructed electricians on how to work on projects.[7]  (*Id*. at 16:9–14.)  Van Huss would also sometimes design customer projects, as "a lot of the plans were lacking from electrical

---

[6] The foreman, in turn, supervised the other employees. (ECF No. 33-1 at 33:5–8.)  The foremen were assigned to the project by Harvey or the general foreman; Van Huss's responsibilities as to these foremen began after that assignment. (*Id*. at 34:9–35:3.)

[7] In his motion, Plaintiff argues he supervised "'the job, not the employees,' had no hire-or-fire power, and followed direction set by management." (ECF No. 33 at 3.)  Van Huss's characterization is not completely supported by the testimony he cites, which is outlined above. *See* Fed. R. Civ. P. 56(c)(1) (noting that a party asserting a fact is genuinely disputed must support the assertion by citing particular parts of the record or showing that the opposition's material does not support the fact).

plans and . . . [he] had to come up with the solutions to make their project work." (*Id*. at 40:15–19.)

From his promotion until the week he was fired, Van Huss was paid $1,160 a week, not counting bonuses, regardless of the hours he worked. (*Id*. at 87:21–88:1, 89:20–24; ECF No. 32-2, Depo. Ex. 16.[8]) Van Huss was not paid overtime, which he has estimated totaled 177 hours. (ECF No. 33-1 at 141:7–142:24.) Van Huss was also not paid a bonus after his termination, which he has estimated should have been up to a $20,000 year-end bonus.[9] (*Id*. at 96:6–10.)

When Van Huss took the PM/E role, Buddy Benson ("Benson"), a BEI manager, told him that he would get bonuses at the end of the year and that the bonuses accumulated and would be paid in December.[10] (*Id*. at 88:19–89:1; *see also* ECF No. 32-5 ¶ 2 (Benson was a manager at BEI).) It was Van Huss's understanding that bonuses were part of his compensation, were held by BEI, and were then paid once a year. (*Id*. at 93:16–19.) When a bonus was paid, BEI would give the employee a sheet that indicated the amount of the bonus; that sheet looked like a job closing calculation sheet, but the calculations were not exactly the same and Van Huss had no proof as to what they were. (*Id*. at 93:25–94:20.) When Van Huss was terminated, he asked about any compensation for bonuses that were earned and Harvey told Van Huss he would check with the board, but Harvey later reported that Van Huss was not eligible for the bonus because he was no

---

[8] For completeness, the Court generally cites to the Van Huss deposition transcript included with Plaintiff's response brief. (ECF No. 33-1.) For deposition exhibits, the Court cites the partial transcript included with Defendant's motion. (ECF No. 32-2.)

[9] Whether Van Huss was entitled to overtime or this bonus is an issue of law discussed below.

[10] BEI disputes that bonuses were mandatory, presenting evidence that both the entitlement and amount were discretionary. (ECF No. 32-3 ¶ 3.)

longer an employee.  (*Id.* at 93:1–16.)  At BEI, an individual had to be employed on the date the bonus was scheduled to be paid in order to be eligible for and receive said bonus.[11] (ECF No. 32-3 ¶ 3.)

### Van Huss's Hearing Issues

During his time at BEI—in either 2020 or 2021—Van Huss got hearing aids at the suggestion of Harvey.  (Def. UMF 16.[12])  The hearing aids were helpful.  (Def. UMF 17.) Van Huss did not need an accommodation to do his job.  (Def. UMF 26.)  Any impairments Van Huss may have had were not factors in Harvey's decision to terminate him.  (ECF No. 32-1 ¶ 14.)

### Van Huss's Termination

Before Van Huss's termination, he had not received any annual performance reviews, nor had he received any reprimands or discussions of customer complaints. (ECF No. 33-1 at 91:7–10.)  Similarly, the only information Van Huss ever received about the foremen and other workers at BEI was that they liked working with him.  (*Id.* at 101:22–102:2.)

While at BEI, Van Huss worked with customers Flintco and Chart.  (*Id.* at 91:11– 92:21; 102:15–103:9.)  Shortly before Van Huss's dismissal on August 16, 2022, a senior project manager for Flintco, a "significant BEI customer," told Harvey that Flintco no

---

[11] Van Huss argues this is disputed, asserting there was no written policy on bonuses, and he was not provided notice of this fact. (ECF No. 33 at 5.) But Van Huss offers no evidence showing a factual dispute.

[12] Van Huss only disputes the date on which he obtained the hearing aids, which is not material here.  (*See* ECF No. 33 at 4.)

longer wanted to work with Van Huss due to his poor communication skills.[13]  (ECF No. 32-1 ¶ 9.)  In August of 2022, a manufacturing engineer supervisor for Chart, Inc.—another BEI customer—requested a meeting with Harvey and Benson, even though Van Huss was the PM/E on the project.[14]  (*Id.* ¶ 10 & Ex. E (showing Chart communicated the request for meeting on August 4, 2022).)  During this meeting, Chart indicated it no longer wanted to interface with Plaintiff because of his poor communication skills and customer service.[15]  (*Id.* ¶ 10.)  Even before these specific complaints, some customers would bypass Van Huss and go directly to Benson with business concerns, which took Benson away from his normal duties managing BEI's business affairs.  (ECF No. 32-5 ¶ 3.)  Near the end of Van Huss's employment, Harvey became aware of this, and it eroded Harvey's confidence in Van Huss's ability to maintain and build customer relationships.  (ECF No. 32-1 ¶ 12.)

---

[13] Van Huss argues this statement is hearsay.  (ECF No. 33 at 11.)  The statement would be hearsay if it was being offered for the truth of the fact that Van Huss's alleged poor communication skills led Flintco to decide to no longer work with him.  *See* Fed. R. Evid. 801(c) (hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement").  The statement is <u>not</u> hearsay, however, when offered solely for the significance of the fact that the statement was made—such as when "letters of complaint from customers [are] offered as a reason for cancellation of dealer's franchise, to rebut contention that [the] franchise was revoked" for another reason.  *Id.* advisory ctte.'s note to 1972 prop. rules, subdiv. (c).

[14] Van Huss was aware of communication issues with Chart, testifying that Bill Allen (or Allen James) would ask Van Huss about the project; that Van Huss would explain things to him; but that Allen did not understand what Van Huss was trying to communicate.  (ECF No. 33-1 at 92:6–21.)  Van Huss also testified that another Chart engineer would always give him an information sheet on the wrong job.  (*Id.* at 99:23–100:5.)

[15] Again, Van Huss argues this statement is hearsay, but that argument is rejected for the reasons set forth in note 13, *supra*.  The Court has not, however, considered Harvey's vague statement that implies other customers were not satisfied with Van Huss's job performance, as the statement relies on notes for which Harvey gives no date or context.  (ECF No. 32-1 ¶ 11 & Ex. D.)

Harvey was also aware that some BEI employees who worked on Van Huss's projects complained that Van Huss provided them with information that conflicted with what the customers had expressed and, in some cases, neglected to provide employees with necessary information.  (ECF No. 32-1 ¶ 13.)

Further, Van Huss was accused of failing to take necessary measurements and ordering over $9,000 in unusable wire.  (*Id.*)  Van Huss admits he made the order, but he believes Benson made the measurement mistake and then tried to blame his mistake on Van Huss.  (ECF No. 33-1 at 100:11–101:3.)

Following these complaints, on August 16, 2022, Harvey and Benson informed Plaintiff that his employment was terminated due to poor job performance.  (ECF No. 32-1 ¶ 14.)  Harvey and Benson told Plaintiff about customer concerns, but they did not elaborate (ECF No. 33-1 at 91:4–7)—although Van Huss admits they did discuss the complaint from Chart (*id.* at 101:5–12).  Harvey and Benson also brought up the $9,000 wire issue.  (*Id.* at 101:3–4.)  They did not mention any complaints from foremen.  (*Id.* at 101:22–25.)  At the termination meeting, Harvey told Van Huss that he had been thinking about terminating him for two weeks.  (*Id.* at 104:7–13.)

Harvey testifies that the customer complaints, employee complaints, and the wire order mistake caused Harvey to lose confidence in Van Huss's ability to perform his job satisfactorily.  (ECF No. 32-1 ¶ 14.)  Van Huss, however, believes age was a factor in his termination.  (ECF No. 33-1 at 103:10–12.)  Around August 11, 2022, Harvey, Van Huss, and other employees were in a virtual meeting with other BEI branches.  (*Id.* at 103:14–104:5.)  During the meeting, an employee "pointed at one of the girls in the other branch and said 'Who is she?'"  (*Id.* at 103:18–20.)  After identifying her, Harvey "turned to [Van Huss] and said 'I need to replace you with young women like that.'"  (*Id.* at 103:20–22.)

8

Additionally, Harvey asked Van Huss several times when he was going to retire, but Van Huss told him he planned to stay for the full five years. (*Id.* at 104:14–25.) Harvey probably asked this at least once a month, likely starting after Van Huss switched over to Medicare.[16] (*Id.* at 106:6–15.) Harvey also asked Van Huss every two or three months about how he was feeling, whether he was able to keep up, and indicated he was looking "down." (*Id.* at 105:24–106:5, 106:24–107:8.)

In August and September 2022, two younger Project Manager/Estimators started at BEI's Claremore office. Harvey authorized the hiring of Steve Young on August 1, 2022. (ECF No. 33-2 at 7.) Young is approximately 43 years old. (*Id.*) Harvey told Van Huss he was getting another guy on board to be a project manager to take some of the load off Van Huss, but that did not happen. (ECF No. 33-1 at 143:19–23.) Nathan Vowiell was hired for BEI's Joplin office on August 11, 2022, and transferred to Claremore in September 2022. (ECF No. 33-2 at 7; ECF No. 33-3.) Vowiell is approximately 44 years old.[17] (ECF No. 33-2 at 7.)

---

[16] Van Huss applied for Social Security and Medicare in 2022, receiving his notice of award on August 2, 2022. (ECF No. 33-1 at 45:17–46:2, 46:12–14; 47:2–11; *see also* ECF No. 32-2, Depo. Ex. 6 (Social Security notice of award dated July 26, 2022).)

[17] BEI has submitted evidence disputing that Young or Vowiell were hired to replace Van Huss or take over his workload. (ECF No. 32-1 ¶ 15.) Van Huss argues that these two workers did, in fact, replace him, but he offers no admissible evidence for this argument beyond their hiring dates. (ECF No. 33 at 8–9 (citing ECF No. 33-1 at 143:12–145:13, ECF No. 33-2, and ECF No. 33-3).) Van Huss testified that, after his termination, another employee named Alfonso told him that Young quit BEI within a month of August because BEI was putting Van Huss's workload on Young, and that was too much. (ECF No. 33-1 at 144:8–11.) Alfonso worked in parts and did not have a management or supervisory role at BEI. (*Id.* at 108:9–24.) This statement, offered for the truth of the matter asserted, is hearsay. *See* Fed. R. Evid. 801(c); *see also Buettner v. N. Okla. Cnty. Mental Health Ctr.*, 158 F. App'x 81, 83–84 (10th Cir. 2005) (upholding rejection of plaintiff's contention that he was replaced by a younger worker when only evidence was hearsay). The Court will not rely on such evidence.

## ANALYSIS

### I.   Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a fact to be "material," it must be capable of affecting the outcome of the lawsuit; for the dispute over that fact to be "genuine," a rational factfinder must be able to find in favor of the nonmoving party. *Grubb v. DXP Enters., Inc.*, 85 F.4th 959, 966 (10th Cir. 2023). The "mere existence of a scintilla of evidence in support of the [nonmoving party's] position" is not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252. Generally, courts construe all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Facts asserted by the nonmoving party, if supported, are regarded as true. 10A Wright & Miller's Federal Practice & Procedure § 2727 (4th ed. 2025).

When the movant does not bear the burden of proof at trial on a particular issue, it may prevail by showing "a lack of evidence for the nonmovant on an essential element of [their] claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see also* 10A Wright & Miller's Federal Practice & Procedure § 2727.1 (4th ed. 2025) (the "movant can seek summary judgment by establishing that the opposing party has insufficient evidence to prevail as a matter of law, thereby forcing the opposing party to come forward with some evidence"). That said, the nonmovant need not show "that the dispute as to material facts will be resolved in its favor." 10A Wright & Miller's Federal Practice & Procedure § 2727.2 (4th ed. 2025).

A party bolsters or discredits proposed undisputed facts by (A) citing particular parts of materials in the record, including depositions, affidavits, or declarations; or

(B) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," and any affidavit or declaration used "must be made on personal knowledge [and] set out facts that would be admissible . . . ."[18] Fed. R. Civ. P. 56(c)(2), (4). As such, "although affidavits are permissible in <u>form</u>, 'the <u>content or substance</u> of the affidavit must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration.'" *Friends of Animals v. Bernhardt*, 15 F.4th 1254, 1272 (10th Cir. 2021) (quoting *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1210 (10th Cir. 2010)).

## II.    Disability Discrimination Claims

Before addressing BEI's primary arguments, the Court briefly discusses Van Huss's disability discrimination claims under the ADA and OADA.[19] (ECF No. 2-1 ¶¶ 30–37.) In his petition, Van Huss alleges that he required an accommodation and was terminated in violation of the ADA. (*Id.* ¶¶ 31, 34–35.) BEI has moved for summary judgment, asserting that Van Huss cannot establish a prima facie case for discrimination based on either a

---

[18] When challenging admissibility, the "burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56, advisory ctte.'s note to 2010 am., subdiv. (c).

[19] "For purposes of summary judgment, [disability discrimination] claims are evaluated the same way under the ADA and the OADA . . . ." *Lewis v. AT&T Mobility Servs., LLC*, No. 23-CV-00087-SEH-MTS, 2025 WL 1788308, at *3 (N.D. Okla. June 27, 2025).

failure to accommodate or his termination.[20]  (ECF No. 32 at 17–18.)  BEI further argues

that Van Huss cannot show the reasons given for his termination were pretext.[21]  (*Id.* at

18.)  In response, Van Huss abandons his disability discrimination claims, stating he

requested no accommodation and will not present a disability discrimination claim to the

jury.  (ECF No. 33 at 13, 15.)

The undisputed facts show that Van Huss did not require an accommodation and

suffered no discrimination due to any disability.  BEI is entitled to summary judgment on

Van Huss's disability discrimination claims.

## III.    Age Discrimination Claims

Next, the Court considers Van Huss's age discrimination claims under the ADEA

and OADA.  (ECF No. 2-1 ¶¶ 24–29, 36–37.)  BEI again argues that Van Huss cannot

establish a prima facie case or otherwise show that the reasons given for his termination

were pretext.  (ECF No. 32 at 13–17.)  Van Huss counters that the *McDonnell Douglas*

framework is unconstitutional or contrary to Rule 56 and, in any event, there is material

---

[20] In the absence of direct evidence of discrimination, courts use "the *McDonnell Douglas* burden-shifting framework to evaluate an ADA discrimination claim . . . ." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (footnote omitted).  The first step of this framework requires the plaintiff to establish a prima facie case. *Id.*  For a failure-to-accommodate claim, the plaintiff must show (1) he is disabled; (2) he is otherwise qualified; (3) he requested a plausibly reasonable accommodation; and (4) the employer refused to accommodate his disability. *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020).  For a disparate treatment claim, the plaintiff must show (1) he is disabled; (2) he is qualified for the job held or desired; and (3) he was discriminated against because of his disability. *Lincoln*, 900 F.3d at 1192.

[21] If the plaintiff advances a prima facie case of disparate-treatment disability discrimination, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Lincoln*, 900 F.3d at 1193.  From there, "the burden shifts back to the plaintiff to demonstrate that the employer's stated reason is a pretext for discrimination." *Id.*

evidence for both an inference of discrimination and a finding that BEI's given reason for terminating him was pretext.  (ECF No. 33 at 9–13.)

### A.      The ADEA and OADA—Generally

Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his . . . privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  This prohibition is limited to individuals who are at least 40 years of age.  *Id.* § 631(a).  The OADA similarly declares it a "discriminatory practice" for an employer to discharge an individual because of age.  Okla. Stat. tit. 25, § 1302(A)(1).  "Age discrimination claims under the OADA are analyzed under the substantive framework for claims under the" ADEA.  *Cline v. Clinical Perfusion Sys., Inc.*, 92 F.4th 926, 934 (10th Cir. 2024).

In an age discrimination case, a plaintiff "must prove that the challenged employment action was motivated, at least in part, by age"—*i.e.*, that age was "a but-for cause of the employer's adverse decision."  *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080–81 (10th Cir. 2023) (citation modified).[22]  "The plaintiff may carry this burden either by presenting direct evidence of the employer's discriminatory intent or by presenting circumstantial evidence creating an inference of a discriminatory motive using the tripartite *McDonnell Douglas* burden-shifting analysis."  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007).

---

[22] The plaintiff does not need to show that age was the <u>sole</u> motivating factor in the employment decision.  *See Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1277–78 (10th Cir. 2010).  "Instead, an employer may be held liable under the ADEA if other factors contributed to its taking an adverse action, as long as age was the factor that made a difference."  *Id.* at 1277 (internal quotation omitted).

Here, Van Huss has offered no direct evidence of age discrimination. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Id.* at 1117 (internal quotation omitted). Such evidence "demonstrates on its face that the employment decision was reached for discriminatory reasons." *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002); *see Jones v. Azar*, 447 F. Supp. 3d 1121, 1132 (D.N.M. 2020) (citing "a policy that is discriminatory on its face" as an example of direct evidence). "In contrast, statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements." *Riggs*, 497 F.3d at 1117–18 (citation modified).

Because Van Huss relies on circumstantial evidence, the Court turns to the *McDonnell Douglas* framework.

## B.    *McDonnell Douglas* Framework

*McDonnell Douglas* provides a three-step framework for evaluating discrimination clams, aimed at bringing the Court expeditiously and fairly to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). While this framework has been called "burden-shifting," the ultimate burden of persuasion remains on the plaintiff to show that the defendant intentionally discriminated against him.[23] *Id.* at 308 n.2. More accurately, the framework

---

[23] At the summary judgment stage, of course, the issue is not persuasion, but rather a question of producing evidence demonstrating the existence (or lack) of a genuine dispute as to material facts. *See* Fed. R. Civ. P. 56(a).

"aims to provide a sensible, orderly way to evaluate the evidence that bears on the critical question of discrimination." *Id.* (citation modified). The Supreme Court has not decided whether the framework applies at the summary-judgment stage of litigation. *Id.*; *see also O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (assuming without deciding that the framework applies to ADEA claims at the summary-judgment stage). The Tenth Circuit, however, has repeatedly applied the framework at summary judgment. *See, e.g.*, *Riggs*, 497 F.3d at 1114–15 (ADEA case). The three steps are as follows:

First, "the plaintiff must establish a prima facie case of discrimination." *Markley*, 59 F.4th at 1081. To do this under the ADEA, "the plaintiff must show that (1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person." *Id.* (internal quotations omitted). These elements "are neither rigid nor mechanistic, and their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (citation modified). The fourth element is "a flexible one that can be satisfied differently in varying scenarios." *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005). When a plaintiff is not replaced by a younger worker, he may satisfy this element "with a more general showing that his discharge occurred under circumstances which give rise to an inference of discrimination." *Bolton v. Sprint/United Mgmt. Co.*, 220 F. App'x 761, 766 (10th Cir. 2007) (internal quotations omitted).[24]

Second, if the plaintiff makes the prima facie showing, "the burden of production then shifts to the employer to identify a legitimate, nondiscriminatory reason for the

---

[24] Unpublished decisions are not precedential, but they may be cited for their persuasive value. 10th Cir. R. 32.1(A).

adverse employment action." *Jones*, 617 F.3d at 1278. This burden is "exceedingly light, as [the] stated reasons need only be legitimate and non-discriminatory on their face." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (citation modified). Of course, the employer must still provide "admissible evidence of a legally sufficient explanation . . . ." *Id.* (citation modified).

Third, once the employer identifies this legitimate reason, "the burden shifts back to the employee to prove that the proffered legitimate reason was a pretext for discrimination." *Riggs*, 497 F.3d at 1114–15; *see also Duerr v. Inframark, LLC*, No. CIV-22-550-J, 2023 WL 7553571, at *3 (W.D. Okla. Nov. 14, 2023) (at summary judgment, this means presenting "evidence to establish there is a genuine issue of material fact as to whether Defendant's articulated reason for the adverse employment action was pretextual"). "A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Markley*, 59 F.4th at 1081–82 (quoting *DePaula*, 859 F.3d at 970). A plaintiff may "demonstrate that discrimination was a primary factor by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* at 1082 (internal citation omitted). Similarly, a plaintiff may demonstrate pretext with evidence that the defendant acted contrary to a written or unwritten company policy or practice when making its employment decision. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). "Post-hoc justifications for termination [also] constitute evidence of pretext." *Frappied*, 966 F.3d at 1059.

While the foregoing are appropriate for consideration, courts may not "second guess the business judgment of the employer." *DePaula*, 859 F.3d at 970 (quoting *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017)). "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Id.* at 970–71 (internal quotations omitted). "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear *to the person making the decision*," *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011) (internal quotations omitted), and ask whether the employer honestly believed the reasons given, not whether they were wise, fair, or correct, *DePaula*, 859 F.3d at 971.

Overall, the "critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted . . . reasons." *Walkingstick Dixon v. Okla. ex rel. Reg'l Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1337 (10th Cir. 2025) (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)). Once the plaintiff presents evidence sufficient to create a genuine factual dispute as to the veracity of the defendant's reason, the court presumes a jury could infer that the employer acted for a discriminatory reason and must deny summary judgment. *Jones*, 617 F.3d at 1280.

### C.    Applying *McDonnell Douglas* to Van Huss's Claims

As discussed below, the Court finds that BEI has articulated a legitimate, non-discriminatory reason for Van Huss's firing, but that Van Huss has failed to show a genuine factual dispute as to whether this reason was pretextual. The Court, therefore,

does not need to address whether Van Huss has stated a prima facie case.  *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008).

### 1.    Legitimate, Non-Discriminatory Reason

BEI has satisfied its burden of production at step two of the *McDonnell Douglas* framework, identifying a legitimate, nondiscriminatory reason for its actions.  Plaintiff does not dispute that the reason BEI gives would constitute a legitimate, nondiscriminatory basis for his termination.  Instead, Plaintiff asserts there is "nothing but inadmissible hearsay to support this contention."  (ECF No. 33 at 11.)  Plaintiff is wrong.

BEI has offered affidavits from two persons with personal knowledge who will testify that Harvey received a complaint from a significant BEI client (Flintco) that it no longer wanted to work with Van Huss; that Harvey received a complaint from another client (Chart) that it no longer wanted to "interface" with Van Huss; that certain BEI customers were bypassing Van Huss to communicate directly with Benson on matters routinely handled by a Project Manager/Estimator; that Harvey learned of this; that employees complained about Van Huss; and that Van Huss was accused of being responsible for ordering over $9,000 in unusable wire.  As noted above, the affidavits, themselves, are not disregarded as hearsay—although BEI may not rely on any hearsay contained within the affidavits.[25]  Also, the <u>fact</u> that the complaints were received is not itself hearsay.  (The Court does not treat the content of the complaints as true.)  This is more than enough evidence to back up BEI's articulated reason for Van Huss's termination.

---

[25] Nor does the Court, as discussed *supra*, accept portions of Harvey's affidavit based on his undated handwritten notes.  (ECF No. 32-1 ¶ 11 & Ex. D (stating other customers expressed dissatisfaction with Van Huss due to unsatisfactory customer service).)

### 2. Pretext

At step three, the Court finds Van Huss has failed to point to a genuine issue of material fact from which a jury could find that BEI's given reasons for firing him were pretextual.  Or, more pertinently, Van Huss has failed to point to any genuine issue of material fact from which a jury could make the ultimate decision that BEI intentionally discriminated against him on the basis of his age.

Van Huss first argues that BEI's evidence—which Van Huss emphasizes primarily relies on the testimony of Harvey and Benson—is "as weak as evidence can be," asserting there is no "actual evidence of customer or employee complaints" and "no evidence to support Defendant's contentions about Plaintiff's performance." (ECF No. 33 at 11.)  But the testimony from Harvey and Benson that they received complaints is, itself, direct evidence of the pertinent issue—how the facts appeared to the person making the decision. *See C.R. England*, 644 F.3d at 1044.  Moreover, the evidence is corroborated by circumstantial evidence, including the e-mail string evidencing that Harvey did, in fact, receive a request from a customer to meet without Van Huss, as well as Van Huss's own testimony that there were communication issues with that client (albeit ones he attributed to the client's ignorance).  Similarly, while there is a dispute as to whether Benson or Van Huss was responsible for the failure-to-measure that led to the $9,000 unusable wire order, there is no dispute that Van Huss made the order or that the wire was unusable.

Moreover, Van Huss offers no evidence that in any way contradicts or shows inconsistencies in Harvey's reasoning.  The only evidence before the Court is that Harvey received various complaints and, at most, that Van Huss disagreed that the complaints were correct—not that they were received.  Van Huss points out that he never received annual performance reviews during his 20-to-21 months on the PM/E job and had not

received any reprimands or discussions of customer complaints before his termination. But the only dates in evidence regarding the complaints indicate they occurred in "2022," "August 2022," or "[n]ear the end of Van Huss's employment." (ECF No. 32-1 ¶¶ 9–12.) Even drawing all inferences in Van Huss's favor, this means some complaints were in the last eight months of his employment, while others—including a customer demand not to work with Van Huss—occurred in the last two weeks of his employment. The lack of a prior reprimand does not create an inconsistency from which a jury could find that BEI's real reason for firing Van Huss was different from that stated. *See Markley*, 59 F.4th at 1082 (noting that pretext can be shown at summary judgment through "weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence" (internal quotations omitted)).

Van Huss next argues that post-hoc justifications can be evidence of pretext, arguing an exhibit to Harvey's declaration is just such a post-hoc justification. (ECF No 33 at 12 (citing ECF No. 32-1 Ex. D).) The exhibit is an undated series of handwritten notes about various specific complaints purportedly received about Van Huss's work performance and communication, written so as to refer to Van Huss as "you"—e.g., "Devon with Chart has sent you i[n]formation for the installation of stuff, but you are not getting info to Sean." (ECF No. 32-1 ¶ 11 & Ex. D.) In his affidavit, Harvey states that the exhibit pages "are my handwritten notes which reflect that other BEI customers were not satisfied with Van Huss's job performance." (*Id.* ¶ 11.) As noted above, the Court has not considered the contents of this exhibit as evidence for BEI. However, Van Huss asserts that "there is no evidence these notes were ever shared with Plaintiff" and that the exhibit "is clearly a post-hoc attempt to cover BEI's termination of Plaintiff because of his age."

(ECF No. 33 at 12.)  As the Tenth Circuit noted in *Frappied*, when an employee is given one set of reasons for his termination at the time he is fired but then—after legal action— the employer pivots to provide a different set of reasons for that termination, a jury "could reasonably believe that [the employer] lacks credibility."  966 F.3d at 1059–60.  This is not the case here.

First, there is no evidence that these notes post-date Van Huss's termination—or even the decision to terminate him.  Second, there is no evidence that Van Huss was given a different set of reasons when he was terminated.  Here, Van Huss testified that, when terminated, he was told he was no longer needed, that they had been thinking of terminating him for two weeks, that concerns had been expressed by customers about him ("[b]ut they didn't elaborate who or what"), that he was being blamed for the $9,000 wire mistake, and that a complaint had been made from Devin with Chart (but not from Mike Irvin or the foremen).  (ECF No. 33-1 at 90:3–93:4, 100:11–102:2.)  Considering this, there is no evidence that the handwritten notes are a post-hoc justification that could lead to a reasonable inference that BEI's now-stated reasons for the termination were created after the termination decision was made.

Finally, Van Huss argues that a single comment about replacing him "with young women like that" and questions about his retirement plans create a genuine issue of fact as to pretext.  The Court disagrees.  "[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees."  *Maughan v. Alaska Airlines, Inc.*, 281 F. App'x 803, 807 (10th Cir. 2008) (quoting *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492, 497 (8th Cir. 1998)) (but noting that, in the case before it, the inquiry came in conjunction with other facts indicating pretext).  Further, "[a]ge-related comments referring directly to the plaintiff can support an inference of age

21

discrimination, but isolated or ambiguous comments may be, as here, too abstract to support such an inference." *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) (citation modified); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (comments that hospital needed "some new young blood" and that "long-term employees have a diminishing return" were best characterized as stray remarks insufficient to create a jury issue); *Kawahara v. Guar. Bank & Tr.*, 835 F. App'x 386, 390 (10th Cir. 2020) (calling plaintiff an "old lady" was too isolated or ambiguous to support an inference of discrimination). "A plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement and the company's termination decision," thereby indicating "that age actually played a role in the defendant's decisionmaking process and had a determinative influence on the outcome." *Stone*, 210 F.3d at 1140 (internal citation omitted). "The Tenth Circuit has established that a single age-related comment, even if made by a decisionmaker, may not be 'sufficient to infer discriminatory intent.'" *Id.* at 1141 (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)).

Here, the Court finds Harvey's comment on the video conference to be the type of single age-related comment that is too isolated and ambiguous to support an inference of discrimination—even occurring, as it did, a week before his termination. The same is true about Harvey asking Van Huss, after he went on Social Security and Medicare, when he was going to retire—even though it occurred on multiple occasions. This is particularly true given the context of this case, where Harvey promoted Van Huss into the PM/E job

less than two years earlier, at the age of 64.[26]  More importantly, taking all the undisputed evidence as a whole, the undersigned finds that a reasonable jury could not find Van Huss's age to be a but-for cause of his termination.  As such, the Court finds that BEI is entitled to judgment as a matter of law on Van Huss's claim for discrimination under the ADEA and OADA.

### D.      Continued Viability of *McDonnell Douglas*

Finally, Van Huss complains that the *McDonnell Douglas* framework is unconstitutional and contrary to Rule 56.  (ECF No. 33 at 9–10.)  Certainly, as applied at the summary judgment stage, there have been pointed and persuasive criticisms of the use of the framework.  *See Brady*, 520 F.3d at 493–94 (criticizing and forbidding use of the prima facie stage at summary judgment in Title VII case); *Ames*, 605 U.S. at 322–26 (Thomas, J., concurring) (raising serious doubts on multiple grounds about the use of *McDonnell Douglas* at summary judgment); *Jenny v. L3Harris Techs., Inc.*, 144 F.4th 1194, 1201–03 (10th Cir. 2025) (Eid, J., concurring) (writing separately to underscore the problems with *McDonnell Douglas* and its fixation on pretext).

---

[26] The Tenth Circuit has recognized "a strong inference that the employer's stated reason for acting against the employee is not pretextual" when the employee was hired and fired by the same person within a relatively short time span. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) (internal quotations omitted); *id.* at 1183 n.4 (citing cases where this time period was eight days, three months, six months, 11 months, one year, and four years).  Even when the inference is applied, however, the plaintiff has the opportunity to present countervailing evidence of pretext. *Id.* at 1183; *see also Brunner v. GN Bank, N.A.*, No. 21-CV-02242-TC, 2023 WL 2474683, at *15 (D. Kan. Mar. 13, 2023) (applying strong inference in ADEA case but finding it dispelled in the face of evidence that the decisionmaker's view of the plaintiff's age changed over the course of the employment).  The Court does not apply a "strong inference" against Van Huss in this case, given the amount of time between Van Huss's promotion and termination, which would fall on the far end of the "relatively short time span" spectrum.  But Harvey's role in the hiring and firing is still part of the overall context in which Van Huss's evidence must be viewed—again, drawing all reasonable inferences in Van Huss's favor.

As noted above, the Supreme Court has only assumed, without deciding, that the *McDonnell Douglas* framework applies at summary judgment. *Ames*, 605 U.S. at 308 n.2; *O'Connor*, 517 U.S. at 311. As a result, Justice Thomas has kindly pointed out that, "[i]n the meantime, litigants and lower courts are free to proceed without" it. *Ames*, 605 U.S. at 326 (Thomas, J., concurring).

The Tenth Circuit may be in a position to take Justice Thomas's advice, but this Court is not. This Court is bound by Tenth Circuit precedent, and that precedent teaches that the *McDonnell Douglas* framework is appropriately used at the summary judgment stage. *See, e.g.*, *Riggs*, 497 F.3d at 1114; *see also Jenny*, 144 F.4th at 1202 n.1 (Eid, J., concurring) ("our Circuit has treated [the *McDonnell Douglas* framework] as the presumptive mechanism by which to resolve employment discrimination claims at summary judgment").

Still, the Court notes that it ultimately uses the framework merely as an orderly way to evaluate evidence under Rule 56. And, as noted above, in this case Plaintiff has failed to put forward a genuine issue of material fact as to BEI's discriminatory intent—whether discussed in terms of "pretext" or not.

## IV.   FLSA Claims

BEI also argues that it is entitled to summary judgment on Van Huss's claims for unpaid overtime, because Van Huss falls under the administrative employee exemption. (ECF No. 32 at 18–19.) Van Huss counters that BEI bears the burden of showing this exemption and that it has failed to meet that burden. (ECF No. 33 at 13–14.)

### A.   FLSA Exemptions—Generally

Pursuant to 29 U.S.C. § 207, the "FLSA requires employers to pay covered employees overtime equal to one-and-one-half times their normal pay for work in excess

of forty hours in a week." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1155 (10th Cir. 2012). The "FLSA exempts employers from this requirement for certain kinds of employees," *id.*, including "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1) (emphasis added). An employer bears the evidentiary burden of showing an exemption, by a preponderance of the evidence. *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025). The exemptions are given a "fair reading," and there is no principle that the exemptions should be construed narrowly.[27] *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018). "The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ." 29 C.F.R. § 541.2.

## B.    Administrative Capacity Exemption

At the time of Van Huss's employment, an administrative capacity employee was defined by the regulations as one who is "(1) Compensated on a salary or fee basis . . . at a rate of not less than $684 per week . . .; (2) Whose primary duty is the performance of

---

[27] The Court, therefore, rejects Van Huss's argument that the defendant must show the applicability of an exemption "plainly and unmistakably." (ECF No. 33 at 13.) First, in the case cited by Van Huss, the Tenth Circuit explicitly rejected the assertion that this described the employer's burden, deciding instead that it was part of the legal finding to be made by the court. *Lederman*, 685 F.3d at 1157–58. Second, even as to the legal finding, the Tenth Circuit based this formulation on the requirement that exemptions to the FLSA are to be "narrowly construed." *Id.* at 1156–57. Given *Encino*'s rejection of the narrow-construction principle, the "plainly and unmistakably" requirement cannot survive. *Cf. Encino Motorcars*, 584 U.S. at 99 n.7 (Ginsburg, J., dissenting) (noting that the majority opinion rejects the longstanding principle that "FLSA 'exemptions are to be narrowly construed against the employers . . . and their application limited to those [cases] plainly and unmistakably within their terms and spirit.'" (second alternation in original, emphasis added)); *see also Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 733 (10th Cir. 2020) (noting this issue and assuming, without deciding, that "fair reading" and not the "plainly and unmistakably" language governs a Colorado statute interpreted in line with the FLSA).

office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (2022). The question of how an employee spends their time at work is a question of fact; the determination of whether those work activities bring them within an exception to the FLSA's overtime pay requirements is a question of law. *Gagnon v. Res. Tech., Inc.*, 19 F. App'x 745, 747 (10th Cir. 2001).

### 1. Salary Basis

The undisputed facts show that Van Huss was paid on a salary basis of not less than $684 per week. An employee is "paid on a 'salary basis' . . . if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a) (2022).

As noted in the factual background section above, it is undisputed that—until the week he was fired[28]—Van Huss was uniformly paid $1,160 per week, regardless of the hours worked. Moreover, there is no evidence that this amount was ever reduced based on the quality of work performed. Van Huss was paid on the requisite salary basis to be considered employed in an administrative capacity.

---

[28] "An employer is not required to pay the full salary in the . . . terminal week of employment. Rather, an employer may pay a proportionate part of an employee's full salary for the time actually worked in the . . . last week of employment." 29 C.F.R. § 541.602(b)(6) (2022).

### 2.   Primary Duty:  Non-Manual Work Directly Related to Management or General Business Operations of Employer

The undisputed facts also show that Van Huss's primary duty was non-manual work directly related to the management or general business operations of BEI.

An employee's primary duty "means the principal, main, major or most important duty that the employee performs."  *Id.* § 541.700(a) (2022).  This determination is "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.*  Factors to consider when determining this include (1) the relative importance of the exempt duties compared with other duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  *Id.*  The "amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee," and "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."  *Id.* § 541.700(b) (2022).

"Work directly related to management or general business operations," meanwhile, includes

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

*Id.* § 541.201(b) (2022).

It is undisputed that Van Huss spent only 15-to-20 percent of his time doing manual labor.  The rest of his time was spent working in functional areas like budgeting,

quality control, purchasing or procurement, personnel management, and similar activities. He prepared project bids, designed projects and solutions for customers, procured equipment, inspected employee and contractor work, supervised and instructed other employees, tracked costs, made work schedules, etc. This work was directly related to the general business operations of BEI, as an electrical contractor that specializes in providing services and knowledge to clients on electrical projects. *See Id.* § 541.201(a) (2022) ("an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment"); *see also Markle v. Drummond Advisors, LLC*, No. 19-CV-02789, 2022 WL 4604192, at *5–7 (N.D. Ill. Sept. 30, 2022) (discussing the administrative/production dichotomy in similar factual circumstances). Both in time and importance, Van Huss's exempt work overshadows the non-exempt work performed and, once the foremen on a job were assigned, Van Huss took charge as the manager of the project—with no evidence of direct supervision from others.

Citing *Gottlieb v. Construction Services & Consultants, Inc.*, Van Huss argues that he was not involved in "running or servicing" BEI, because his project management job was how BEI made money, not how it handled its finances or employee benefits. (*See* ECF No. 33 at 14 (citing No. 05-14139-CIV, 2006 WL 5503644 (S.D. Fla. July 24, 2006).) But *Gottlieb* reads the exemption too narrowly, focusing on HR and accounting type work, when the regulations include much more.[29] Instead, the Court is persuaded by cases that

---

[29] *Gottlieb* was decided under the now-inapplicable principle that the "overtime provisions of the FLSA are narrowly construed against the employer," 2006 WL 5503644 at *4, rather than being given a "fair reading," *Encino Motorcars*, 584 U.S. at 88–89.

have found employees with similar responsibilities to Van Huss to be working in an administrative capacity. *See, e.g.*, *Hall v. Bassett & Assocs., Inc.*, No. 20-CV-01067-NRN, 2021 WL 1978743, at *6 (D. Colo. May 17, 2021) (superintendent for general contractor employer who needed individuals in plaintiff's role to supervise, direct, and coordinate with subcontractors to ensure building will be built on time); *Self v. Meritage Homes Corp.*, No. CIV.A. G-11-0070, 2014 WL 2171468, at *3–4 (S.D. Tex. May 23, 2014) (construction manager for home builder who worked in budgeting, purchasing, and procurement; quality control; managing subcontractors; and customer relations and satisfaction); *see also* Department of Labor, ¶ 31,609 Opinion Letter of the Acting Administrator, Wage and Hour Division (FLSA2018-10), 2018 WL 405231 (Jan. 5, 2018) (finding project manager for home building company's primary duties related directly to management or general business operations, where most time was spend directing, managing, scheduling, and paying subcontractors and suppliers; evaluating work or ordering corrections to deficiencies; and recommending dismissal of unsatisfactory subcontractors or suppliers).[30]

The Court finds the undisputed facts show Van Huss's primary duty as a PM/E was the performance of non-manual work directly related to the general business operations of BEI.

---

[30] Opinion letters are entitled to the Court's respect to the extent the agency's interpretation of the regulation has "the power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (internal quotation omitted). The undersigned finds this DOL opinion letter persuasive.

### 3. Primary Duty:  Includes the Exercise of Discretion and Independent Judgment on Matters of Significance

Finally, the undisputed facts show that Van Huss's primary duty included the exercise of discretion and independent judgment with respect to matters of significance.

"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a) (2022).  The Court decides whether this relates to "matters of significance" based on "the level of importance or consequence of the work performed."[31]  *Id.*  Factors to consider include, among others,

> whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; [and] whether the employee investigates and resolves matters of significance on behalf of management . . . .

*Id.* § 541.202(b).

While the "discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision," these decisions can be "reviewed at a higher level."  *Id.* § 541.202(c).  Discretion and independent judgment do not require an employee's decisions to "have a finality that goes

---

[31] "An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly."  *Id.* § 541.202(f).

with unlimited authority and a complete absence of review." *Id.* Yet, the "exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.* § 541.202(e).

An example of the type of employee that generally falls within the administrative exemption is the "employee who leads a team of other employees assigned to complete major projects for the employer . . . even if the employee does not have direct supervisory responsibility over the other employees on the team." *Id.* § 541.203(c) (2022). Further, "[p]urchasing agents with authority to bind the company on significant purchases generally meet the duties requirements," *id.* § 541.203(f), while "[o]rdinary inspection work generally does not," because such inspectors "have some leeway in the performance of their work but only within closely prescribed limits," *id.* § 541.203(g).

Here, Van Huss attempts to divide his job into two roles—estimator and project manager—agreeing that he exercised discretion and independent judgment as the former, but not the latter. However, Van Huss's role—whether compartmentalized or viewed as a whole—primarily involved the exercise of discretion and independent judgement. He estimated costs for projects of significant size and made decisions and recommendations based on his evaluation of a variety of factors. He supervised foremen after they were assigned and decided when and how work was to be done on a project. Sometimes, he even designed the customer projects, coming up with solutions to make them work. This is consistent with the type of work other courts have found required discretion on matters of significance. *See, e.g., Hall*, 2021 WL 1978743, at *7 (D. Colo. May 17, 2021) (superintendent exercised such independence and discretion when he scheduled subcontractors, directed and inspected work on the project, met with customers,

coordinated some permitting, and had the ability to make purchases for the project and sign binding documents); *Self*, 2014 WL 2171468, at *5–7 (construction manager exercised sufficient independence and discretion when he determined timing of construction tasks, made recommendations on or selected tradesmen or contractors, decided when the company's standards were met, decided when to request additional or different materials, and could make changes to resolve customer complaints)

As such, the Court finds the undisputed facts show that Van Huss's primary duty included the exercise of discretion and independent judgment with respect to matters of significance. Van Huss, therefore, qualified as an exempt administrative employee.

## V.   OPLA Claims

Lastly, the Court considers Van Huss's claim that BEI's failure to pay him a 2022 bonus violated the OPLA. BEI argues that the terms of its policy required Van Huss to be employed when the bonus was paid before he could be entitled to that bonus. (ECF No. 32 at 19–20.) Van Huss argues such a policy must be in writing to be recognized. (ECF No. 33 at 14.) The Court finds that the undisputed material facts show that BEI is entitled to judgment as a matter of law.

Under the OPLA, when "an employee's employment terminates, the employer shall pay the employee's wages in full, less offsets and less any amount over which a bona fide disagreement exists . . . ." Okla. Stat. tit. 40, § 165.3(A). Wages include "bonuses and other similar advantages agreed upon between the employer and the employee, which are earned and due, or provided by the employer to his or her employees in an established policy . . . ." *Id.* § 165.1(7).

To establish a claim under the OPLA, an employee must show: "1) an employer-employee relationship; 2) wages are earned and due or provided in an established policy;

3) employment was terminated; and 4) the employer failed to pay the employee's wages at the next regular pay day after termination." *Coen v. SemGroup Energy Partners G.P., LLC*, 2013 OK CIV APP 75, ¶ 17, 310 P.3d 657, 662 (footnotes omitted).

Here, the undisputed evidence is that BEI's bonus policy requires an employee to be employed on the date the bonus was scheduled to be paid in order to receive it. Van Huss was not employed on the required date. Van Huss has done nothing to dispute this portion of the policy, but instead faults BEI for not providing <u>additional</u> written evidence beyond the testimony of its Corporate Secretary/Treasurer. (*See* ECF No. 32-3.) Van Huss cites a 1955 Oklahoma case for the proposition that there must be such a writing. (ECF No. 33 at 14 (citing *Sooner Broad. Co. v. Grotkop*, 1955 OK 29, ¶ 19, 280 P.2d 457, 461).) But *Sooner Brand* was not decided under the OPLA, and it stands for the rather unremarkable position that evidence of custom or usage is not admissible to vary, add to, or contradict the terms of an unambiguous contract. *Id*. ¶ 22. Indeed, the case holds that the employee's entitlement to a bonus "depends entirely upon the contract entered into between the employer and employee." *Id*. ¶ 0 (syl. 1).[32] Van Huss presents no evidence that the contract between him and BEI included a provision that terminated employees were eligible for bonuses; the only evidence presented is that they were not. Van Huss further presents no evidence that he was still employed at BEI when bonuses were paid. *Cf. Cooper v. Matrix Serv. Co.*, No. 13-CV-584-GKF-PJC, 2014 WL 7243265, at *7–8 (N.D. Okla. Dec. 19, 2014).

---

[32] The syllabus of a decision of the Oklahoma Supreme Court states the law of Oklahoma, when interpreted with reference to the underlying facts and questions presented. *State ex rel. Cartwright v. Dunbar*, 1980 OK 15, ¶ 30, 618 P.2d 900, 908.

BEI has satisfied its burden of showing that Van Huss is missing an essential element of his claim—*i.e.*, that BEI failed to pay any wages that were earned and due, or that were provided for in an established policy.  BEI is entitled to judgment on Plaintiff's claim under the OPLA.

## CONCLUSION

IT IS THEREFORE ORDERED that BEI's *Motion for Summary Judgment* (ECF No. 32) is GRANTED.  Van Huss's claims against BEI are DISMISSED WITH PREJUDICE.  A separate judgment will issue.

ORDERED this 6th day of October, 2025.

_____
SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT